STATE OF MAINE                                        SUPERIOR COURT
PENOBSCOT, ss.                                        CIVIL ACTION
                                                      DOCKET NO.: CV-13-126


RANDY N. OLIVER, II AND NICOLE JERNIGAN,
PERSONAL RERESENTATIVES of the
ESTATE OF RANDY N. OLIVER and
RANDY N. OLIVER, II AND NICOLE JERNIGAN,

        Plaintiffs

                v.                                    **JUDGMENT**

EASTERN MAINE MEDICAL CENTER,

        Defendant


This matter came before the Court for a jury-waived trial on June 6, 7, 9, 16 and 17,

2016[1]. The Plaintiffs were represented by Attorney Peter Clifford. The Defendant was

represented by Attorney Edward Gould.

## FACTS

Randy Oliver, the decedent and father of the Plaintiffs, was admitted to EMMC on

March 21 - 22, 2013 and discharged on May 16, 2013. Less than ten hours after his release,

Mr. Oliver died in a house fire at his residence. The cause of death was smoke inhalation.

On March 21, 2013, Mr. Oliver's daughter, Nicole Jernigan, and his former spouse,

Patricia Oliver, found Mr. Oliver in a terrible state at his home and took him to Eastern

Maine Medical Center (EMMC) emergency room. EMMC is an acute care hospital. EMMC

---

[1] The Court also held a conference with counsel on July 15, 2016 and informed counsel that the three (3) notebooks of medical records provided to the Court as Exhibits were not complete and did not have many Bates-numbered documents. Counsel agreed that a complete copy of the Bates-numbered documents would be reproduced and provided to the Court, and that was done on July 18, 2016 in the form of four (4) notebooks, bates 1 - 1387.

1

was informed of the poor living conditions of Mr. Oliver's home, including a lack of running water, and that Mr. Oliver was urinating in bottles and defecating on the basement floor. The family also provided photographs of Mr. Oliver's living conditions to EMMC. Dr. Podraza concluded that the photographs "clearly showed a fire hazard". Mr. Oliver had second degree burns on his hands at admission, and EMMC (Dr. Podraza) was told that things had caught on fire in his living room on more than one occasion. EMMC was also informed that Mr. Oliver had been scammed out of his money on more than one occasion.

When Mr. Oliver was admitted to EMMC he was diagnosed with: 1) acute chronic hepatic encephalopathy; 2) alcohol withdrawal syndrome needs to be ruled out; 3) deterioration of functional status; 4) possible protein calorie malnutrition; and 5) neglected state. His ethanol level at admission was 310 g/dl.

On March 22, 2013, Mr. Oliver had an emergency psychiatric evaluation and a psychiatric consult. The psychiatric consult performed by Dr. Singer noted that Mr. Oliver "likely does have significant cognitive impairment that would be slow to resolve". Dr. Singer suggested that alcohol dementia was a possibility to rule out. Dr. Singer further indicated that "his alcohol addiction is potentially lethal, and I would support involuntary hospitalization and blue-papering if he attempts to leave again. The eventual appointment of a guardian may be needed." The emergency psychiatric evaluation report summarized that Mr. Oliver had "an inability to care for himself"; however, because Mr. Oliver was admitted medically to EMMC, no action was taken as a result of the emergency psychiatric evaluation. During the emergency psychiatric evaluation, Mr. Oliver was oriented to person and place, but not situation. During this evaluation, Mr. Oliver was able to correctly identify

2

the season, month and year and was able to inform the examiner that his son was a lawyer with the FBI.

A 1:1 aide was assigned to be with Mr. Oliver during his hospital stay. The 1:1 aide prevented Mr. Oliver from leaving EMMC, despite his on-going desire to do so. A 1:1 aide remained with Mr. Oliver essentially from admission through discharge.

Mr. Oliver had a CT scan on March 22, 2013. The CT Scan was read as showing "atrophy greater than expected for his age".

Anthony Podraza, Ph.D., a neuropsychologist, examined Mr. Oliver on March 28, 2013. Despite other observations, Dr. Podraza found that Mr. Oliver was a "fairly accurate historian". On March 28, 2013, Mr. Oliver reported that his "biggest problem ... was getting his System 2000 water heater to work". The evaluation was terminated due to Mr. Oliver's poor motivation and lack of effort. At that time, Dr. Podraza opined that Mr. Oliver: 1) did not have the capacity to manage simple or complex finances independently, and 2) was not able to make informed decisions regarding his health.

In accord with EMMC's suggestion, Mr. Oliver's children, Nicole Jernigan and Randy Oliver II, petitioned the Waldo County Probate Court to be named as guardians for their father. In support of their Petition, they submitted the medical report of Dr. Redding. Dr. Redding's report was based on his April 1, 2013 examination of Mr. Oliver. In his report, Dr. Redding opined that Mr. Oliver's prognosis was "probably poor for recovery of appropriate insight necessary for self care".

Kathryn Kreamer was appointed by the Probate Court to be a "visitor". Ms. Kreamer interviewed Mr. Oliver on April 11, 2013 for approximately one hour. During the interview with Ms. Kreamer, Mr. Oliver was able to relate a fair amount of background information.

3

He was able to easily converse, especially when describing the technical or mechanical aspects of his home and heating system. Ms. Kreamer relied on, among other things, the medical professionals' opinions and Mr. Oliver's denials or minimizations of his behaviors in forming her opinions. Ms. Kreamer recommended that a guardianship be granted and that Mr. Oliver be placed in a locked dementia facility.

An EMMC discharge planner made a referral for a Goold Assessment. On April 16, 2013, Susan Manocchio, RN, completed the Goold Assessment. The purpose of the Goold Assessment was to determine whether Mr. Oliver qualified for Maine Care-funded residential care. Ms. Manocchio spoke with Mr. Oliver for a "few minutes". Ms. Manocchio used a computerized assessment tool and determined that Mr. Oliver qualified for residential care.

Mr. Oliver was treated at EMMC over the course of several weeks. There is no dispute that Mr. Oliver received appropriate medical care while at EMMC. Mr. Oliver was placed on an "alcohol-withdrawal protocol". His condition was well-managed, and his issues with withdrawal resolved. His hepatic encephalopathy dramatically reversed.

Hospitalists at EMMC generally work one week on, and one week off. On May 7, 2013, Dr. Al- Sawalha, a hospitalist, began a rotation that included caring for Mr. Oliver. Upon assuming care for Mr. Oliver, Dr. Al-Sawalha questioned why Mr. Oliver was remaining as an in-patient at EMMC. Based on his observations, Dr. Al-Sawalha ordered a repeat neuropsychological examination. Dr. Al-Sawalha rotated off duty on May 12, 2013.

On May 7, 2013, the Waldo County Probate Court named Nicole Jernigan and Randy Oliver II as co-guardians for their father. The Probate Court's decision to name co-guardians for Mr. Oliver was based on the April 1, 2013 report from Dr. Redding. The

4

Probate Court did not have the second Dr. Podraza report when issuing the May 7, 2013 order. The "Letters of Guardianship" provide:

> Limitations: This Court limits this guardianship as follows:
> The Limited Guardian(s) shall encourage the development of maximum self-reliance and independence of the above-named person and *act only as necessitated by the above-named person's actual mental and adaptive limitations or other conditions warranting this procedure* (emphasis added).

On May 7, 2013, the same day as the Probate Court proceeding, Dr. Podraza re-examined Mr. Oliver. Dr. Podraza's findings on May 7, 2013 were strikingly different than those he made on March 28, 2013. Dr. Podraza found that Mr. Oliver was:

> alert, friendly, pleasant, and very cooperative, clean shaven man... Unlike his previous evaluation, he had no problems transitioning from sitting to standing or walking around his room. He walked slowly and his activity level was mildly subdued. He was orientated to person, place, and time. He understood the purpose of the evaluation. He reported that he is anxious to return to his home from the hospital. He exhibited good eye contact ... Rapport was easily established. His speech was improved, but soft. He had a breathy quality to his speech, but all his words were understandable, unlike the mumbling he exhibited last examination. His tone, pacing, prosody, and volume were within normal limits. There was no evidence of paraphasic errors or word retrieval problems. His conversation was logical and appropriate. ... He stated that he has lived alone for 25 years and felt he could take care of himself ... Cognitively, he denied problems with attention/concentration, memory, organization, planning, and reasoning. Emotionally, he stated that he is anxious to return home to take care of his home. He stated that he is planning on quitting drinking. ... He reported that he was not planning to go to AA or therapy. He stated that now that summer is coming he can start fixing his house. He indicated that he will be hooking up his System 2000 water heater .... He stated he also plans on having the toilet running.

5

Dr. Podraza concluded that Mr. Oliver *now*: 1) has the capacity to manage simple or complex finances independently; and 2) has the capacity to manage his person. Dr. Podraza also recommended that Mr. Oliver's discharge plan include referral to a community case manager and a referral to address his chronic pain.

Between May 7, 2013, the day of both the Guardianship hearing and the second Podraza evaluation, and May 16, 2013, when Mr. Oliver was discharged, EMMC and Mr. Oliver's guardians had opposing opinions about discharge. EMMC determined Mr. Oliver did not need any acute medical care and that it may be holding Mr. Oliver against his will. The Guardians opposed discharge to anywhere other than a locked facility.

Mr. Oliver himself consistently demanded release from EMMC. As early as the first day he was at the hospital, the medical records reflect his request to "go home". Mr. Oliver's desire to return home did not change. In addition to expressing his desire to return home, Mr. Oliver attempted to leave the hospital and/or made plans to leave the hospital against medical advice. In fact, the 1:1 aide was critical in keeping Mr. Oliver from leaving the hospital.

Upon learning that EMMC believed that Mr. Oliver had regained capacity, the guardians disputed that finding and requested another neuropsychological evaluation. The guardians attempted to locate an examiner who was not connected to EMMC to conduct the evaluation, but were unable to find an examiner who could conduct the evaluation in a timely manner. On May 14, 2013, EMMC told the guardian(s) that they could have until May 17, 2013 to find an independent evaluator, and if they did not, EMMC would have a second evaluation by another EMMC practitioner. Later on May 14, 2013, the guardian(s) informed

6

EMMC that they did not want a second evaluation and EMMC dropped arranging for another evaluation.

On May 13, 2013, Mr. Cravens, a certified nurse practitioner, was the provider assigned to Mr. Oliver. At that time, Mr. Cravens concluded that Mr. Oliver had been medically stable for some time and that he did not need to be in the acute care hospital. However, Mr. Cravens understood that Mr. Oliver was prohibited from leaving due to "other issues" (legal).

EMMC's attorney was involved in the legal determination of whether Mr. Oliver could be discharged given the guardians' directive that he not be discharged. After the guardians stated they did not want a second evaluation, EMMC's attorney told clinical staff that Mr. Oliver could be discharged (from a legal point of view) after it had been determined that he had regained capacity. The attorney initially indicated that EMMC would have to follow the guardians' directives, which Mr. Woolley communicated to the guardian(s); but after reviewing the "Letters of Guardianship", EMMC's attorney determined that Mr. Oliver could not be held against his will after he regained capacity. By May 16, 2013, EMMC, through its attorney, determined that Mr. Oliver could be released from the hospital - from a legal standpoint - if he had regained capacity.

On May 15 and 16, 2013, Mr. Woolley assisted Mr. Oliver in completing paperwork to terminate the guardianship. This paperwork was never filed with the Waldo County Probate Court. To complete the Indigency Affidavit in support of his request for an attorney, Mr. Oliver needed to inform the Court of the amount of his monthly social security income and the balance of his bank account. On May 15, 2016, Mr. Woolley suggested that Mr. Oliver obtain this information. Upon Mr. Woolley's arrival at the hospital on May 16,

7

2013, Mr. Oliver indicated that he had called his bank and had obtained both the balance of his bank account and the amount of his monthly social security income.

EMMC eventually followed Mr. Oliver's request to be released to his home. In particular, on May 16, 2013, Mr. Cravens, was still the person in charge of Mr. Oliver's care. Again, Mr. Cravens spent about 15 minutes talking directly with Mr. Oliver. Mr. Oliver remained medically appropriate for discharge on May 16, 2013. Mr. Cravens made his own assessment of Mr. Oliver based upon his review of Mr. Oliver's record, and on his conversations with EMMC staff and Mr. Oliver himself. Based on his own assessment, and relying heavily on Dr. Podraza's assessment, Mr. Cravens determined that Mr. Oliver had sufficient capacity to manage his own affairs, and he discharged Mr. Oliver.

The diagnoses at discharge were: 1) alcohol withdrawal, and 2) probably alcohol-induced dementia. The discharge plan contained a review of Mr. Oliver's on-going medications and a referral back to his PCP. The discharge plan also incorporated the recommendations made by Dr. Podraza, including a referral for pain management at the Pain Clinic and community case management. Mr. Oliver declined the suggestion that he participate in substance abuse treatment and the suggestion that he attend AA.

On May 16, 2013, Mr. Woolley left a message for a co-guardian informing him that Mr. Oliver would be discharged later that day. Later, at approximately 1 pm on May 16, 2013, Mr. Woolley called Nicole Jernigan and informed her that Mr. Oliver would be released at 2 pm. Ms. Jernigan expressed her strong opposition to the discharge. EMMC also offered to get Mr. Oliver a taxi to be driven to either Ms. Jernigan's or her mother's, Patricia Oliver, residence. Ms. Jernigan and Ms. Oliver declined this suggestion. Mr. Oliver left EMMC with his fried, Mr. Ayer, at approximately 2:50 pm on May 16, 2013.

8

Ms. Jernigan and her mother visited with Mr. Oliver twice at his home between his discharge and the time of the fire in which Mr. Oliver lost his life. As they were leaving around 8:45 or 9:00 pm, they observed that Mr. Oliver was "definitely inebriated".

Tragically, sometime around 10 pm on May 16, 2013, Mr. Oliver's home became fully involved in a fire. His remains were found inside several hours later.

## LEGAL ANALYSIS

### I. Negligence

Plaintiffs argue that EMMC should not have discharged Mr. Oliver without the guardians' consent and that EMMC failed to discharge Randy Oliver with a safe and reasonable discharge plan. EMMC argues that it was compelled to discharge Mr. Oliver once it determined that he had regained capacity and that Mr. Oliver was discharged with a safe and reasonable discharge plan.

Whether or not Mr. Oliver had capacity will dictate whether or not EMMC was bound to follow Mr. Oliver's demand he be discharged. The parties agree that whether Mr. Oliver had capacity influences the specific duty at discharge. Given the existence of the guardianship, the Court analyses not only whether EMMC was negligent in determining Mr. Oliver's capacity, but also whether Mr. Oliver had capacity.

Therefore, to determine whether EMMC provided Mr. Oliver with a safe and reasonable discharge plan, the Court must first determine whether Mr. Oliver had the capacity to manage his person on May 16, 2013.

After full consideration of all of the evidence in this case, the Court finds that EMMC was not negligent in determining Mr. Oliver's capacity and that Mr. Oliver had the capacity to manage his person on May 16, 2013.

## A. Capacity

### 1. Standard of Capacity

Mr. Oliver was the subject of a limited guardianship on May 16, 2013.

On May 7, 2013 the Probate Court (Longley, J.) ordered a "Limited Guardianship". The "Letters of Guardianship" stated, among other things:

> Limitations: This Court limits this guardianship as follows: The Limited Guardian(s) shall encourage the development of maximum self-reliance and independence of the above-named person and act *only as necessitated by the above-named person's actual mental and adaptive limitations or other conditions warranting this procedure* (emphasis added).

The Probate Code also addresses the obligations of health-care providers. In particular, the Code provides as follows:

> A primary physician who makes or is informed of a determination that a patient lacks *or has recovered capacity* or that another condition exists that affects an individual instruction or the authority of an agent, *guardian*, or surrogate or the validity of an advance health-care directive shall promptly record the determination in the patient's health-care record and communicate the determination to the patient, if possible, and to any person authorized to make health-care decisions for the patient.

18-A M.R.S. § 5-807(c)(emphasis added). The Code also provides:

> A health-care decision made by a guardian for the ward is effective without judicial approval, except under the following circumstances: (1) The guardian's decision is contrary to the ward's individual instructions and other wishes, expressed while the ward had capacity;

*Id.* § 806(c).

10

The Probate Code defines "capacity", as follows:

> "Capacity" means the ability to have a basic understanding of the diagnosed condition and to understand the significant benefits, risks and alternatives to the proposed health care and the consequences of foregoing the proposed treatment, the ability to make and communicate a health care decision and the ability to understand the consequences of designating an agent or surrogate to make health-care decisions.

*Id.* § 801(c). Finally, the Probate Code defines "health-care decision" as follows:

> "Health-care decision" means a decision made by an individual with capacity, or by the individual's agent, guardian or surrogate, regarding the individual's health care, including: (1) selection and discharge of health-care providers and institutions, ...

*Id.* § 801(f).

By May 16, 2013, Mr. Oliver had been at EMMC since March 21, 2013 (nearly two months). There is no dispute that Mr. Oliver was effectively treated during the hospitalization. There is also no dispute that much earlier than May 16, 2013, Mr. Oliver did not have any medical needs that needed to be addressed at an acute care hospital.

Dr. Al-Sawalha assumed care of Mr. Oliver on May 7, 2013, as part of a regular rotation of hospitalists. During Dr. Al-Sawalha's first contact with Mr. Oliver on May 7, 2013, Mr. Oliver was calm and cooperative; he shook the doctor's hand and answered all questions appropriately; his thought processes were appropriate; and he had good eye contact. When Dr. Al-Sawalha first began caring for Mr. Oliver, Dr. Al-Sawalha was sufficiently struck by Mr. Oliver's presentation to question why Mr. Oliver was still hospitalized. As a result, he ordered a repeat neuropsychological evaluation.

Dr. Podraza performed the repeat neuropsychological evaluation. EMMC chose to have Dr. Podraza perform the second neuropsychological evaluation as he had performed

11

the first and thus he had the benefit of his own comparisons. The purpose of the evaluation was to determine whether Mr. Oliver had the capacity to make decisions and manage himself. On May 7, 2013, Dr. Podraza spent approximately one-half hour interviewing Mr. Oliver, plus approximately one hour administering testing to Mr. Oliver.

On May 7, 2013, Dr. Podraza noted a "remarkable" difference in Mr. Oliver. Dr. Podraza found that Mr. Oliver was alert, awake, and responsive. Mr. Oliver remembered Dr. Podraza from the evaluation five weeks earlier. Mr. Oliver engaged in logical and appropriate conversation with Dr. Podraza. Mr. Oliver expressed to Dr. Podraza that he knew why he was being evaluated and that he knew he had to do well on the evaluation to go home. Dr. Podraza believed that Mr. Oliver was highly motivated to participate in the second neuropsychological evaluation given his goal to be released from the hospital. Mr. Oliver's attention to task was high. Mr. Oliver responded to cues and prompts provided by Dr. Podraza.

During this second evaluation, Mr. Oliver acknowledged that he was an alcoholic, and he expressed the desire to stop drinking. This is a demonstration of insight by Mr. Oliver, even though he alternatively explained that *all* his problems were due to the cold weather. Mr. Oliver also expressed a plan to fix certain problems in his home. These expressions of a plan to stop drinking and fix his home demonstrate that Mr. Oliver had the ability to identify, appreciate, and express a choice about the problems of his drinking and the condition of his home. Recognizing a need to do well on the capacity evaluation to further his goal to return home is another example of Mr. Oliver recognizing a problem (being kept in the hospital) and offering a reasonable solution (doing well on an evaluation). Recognizing and understanding a problem, reasoning about approaches to

12

solving the problem, and stating a choice are the essence of having the capacity to make decisions.

Dr. Podraza characterized Mr. Oliver as doing "reasonably well" on the tests he was administered. His overall neuropsychological functioning was in the low average range. The testing pointed to Mr. Oliver having deficits in immediate memory, perceptual motor, and executive function. Mr. Oliver tested as having strengths in visual/spatial skills and attention span, his delayed memory was intact, and his language function for naming ability was good. Dr. Podraza opined that the deficits Mr. Oliver had were not significant enough to find that he did not have capacity. During the testing, Mr. Oliver took a logical approach to the testing and showed a reasoning process that was intact.

Dr. Podraza opined that Mr. Oliver had sufficient capacity to manage his person. Dr. Podraza concluded: "Capacity to Manage his person: Mr. Oliver's neuropsychological status has clearly improved. He has stated a willingness to refrain from alcohol upon his discharge from EMMC. He also expressed a desire to clean up his house to make it livable. Given these factors, it is this examiner's opinion that Mr. Oliver now has the capacity to make better informed decisions regarding his health". While Dr. Podraza could have written a better-worded report, he concluded, based on his testing and investigation, that Mr. Oliver had regained capacity to manage his person. The Court is satisfied that Dr. Podraza - in fact - found that Mr. Oliver had regained capacity by May 7, 2013 even though he used the phrase "Mr. Oliver now has the capacity to make *better informed decisions* regarding his health" (emphasis added). Moreover, had Dr. Podraza determined that Mr. Oliver had improved, but had not yet regained capacity, there would have been no reason for Dr. Podraza to make discharge recommendations.

13

While Dr. Podraza was not pleased that he had not been informed that there was a guardianship proceeding underway, the Court finds that his disappointment does not affect the validity of his ultimate opinion.

Dr. Podraza stated in his report that a CT scan of Mr. Oliver's brain did not reveal any evidence of abnormalities. In fact, the CT scan was read as showing atrophy greater than expected for Mr. Oliver's age. A CT scan looks at structural issues, while a capacity exam looks at functional issues. The Court has carefully considered the results of the CT scan and the fact that Dr. Podraza did not know the actual results of the CT scan when he formed his opinion that Mr. Oliver had regained his capacity to make decisions. The Court accepts that the CT scan findings are non-specific findings and do not establish that Mr. Oliver had functional deficiencies such that he did not have the capacity to make decisions.

The Court is fully convinced that on May 7, 2013, Dr. Podraza concluded that Mr. Oliver had regained the capacity to manage his person, and it was reasonable for the professional staff at EMMC to interpret Dr. Podraza's findings as such.

Dr. Nelson's testimony supports this conclusion. Dr. Nelson, a clinical neuropsychologist and well-qualified expert witness, opined that Dr. Podraza "definitely" met the standard of care in reaching the opinion that Mr. Oliver had the capacity to manage his person. Dr. Nelson based his opinion on the fact that Dr. Podraza utilized acceptable standardized tests, reviewed pertinent medical records, considered collateral sources of information and made careful observations of Mr. Oliver. Dr. Nelson opined that the in-person interview with Mr. Oliver played a critical role in Dr. Podraza's evaluation, and was the most important of the four factors.

14

In addition to opining that Dr. Podraza met the standard of care in conducting the neuropsychological evaluation of Mr. Oliver, Dr. Nelson also opined that Mr. Oliver had intact capacity to make decisions and manage his person on May 7, 2013, and continuing through discharge. In reaching this conclusion, among other things, Dr. Nelson found Dr. Podraza's description of Mr. Oliver's comportment "compelling"; found that Mr. Oliver was well spoken and logical in his conversation; found that Mr. Oliver displayed logical and goal-oriented behavior; and found that, despite some deficits, the test results "were not even close" to questioning Mr. Oliver's capacity. Dr. Nelson opined that aspects of Mr. Oliver's executive functions were well displayed in his comportment during the time he spent with Dr. Podraza. Dr. Nelson opined that Mr. Oliver's plans with respect to stopping his drinking and fixing up his home were reasonable responses, and whether or not the plans were likely was not pertinent to the capacity determination.

Dr. Nelson also testified that the results of the tests Dr. Podraza administered to Mr. Oliver merited further explanation due to the way in which the tests were grouped for reporting. In particular, the test results for immediate memory were impaired. However, that score had two components: 1) remembering a list of words, and 2) remembering a story. Mr. Oliver scored poorly on remembering the list of words, but did well on remembering the story. Remembering the story clearly captures a better assessment of Mr. Oliver's abilities with respect day-to-day functioning than remembering the list of words, and effective strategies were available to remember lists (writing them down). With respect to another composite score, Mr. Oliver was impaired on verbal fluency, but did well on naming objects. The ability to name objects was a critical factor in Dr. Nelson opining that Mr. Oliver did not have dementia.

15

Dr. Fromson, a psychiatrist with a specialty in addiction psychiatry and another well-qualified expert witness, analyzed whether Mr. Oliver had capacity in connection with forming his opinion that Mr. Oliver was properly discharged from the hospital. Dr. Fromson was satisfied that by the time of his discharge, Mr. Oliver's hepatic encephalopathy had been dramatically reversed. Dr. Fromson concluded that Mr. Oliver had sufficient decisional capacity for discharge in that Mr. Oliver could appreciate information, delineate choices and the ramifications of those choices. Dr. Fromson testified that in the context of discharges, capacity determinations generally only involve a discussion between the discharging professional and the patient, and do not ordinarily involve neuropsychological testing. Dr. Fromson further testified that the fact EMMC conducted neuropsychological testing demonstrated EMMC went "above and beyond" in making the capacity decision.

Dr. Voss, a psychiatrist and another well-qualified expert witness, suggested that Mr. Oliver lacked capacity in that he opined Mr. Oliver had "serious impairments in insight and judgment", as well as memory problems. These issues, he explained, caused it to be unsafe to discharge Mr. Oliver to take care of himself because he could not appreciate risks. Dr. Voss based this opinion on, among other things, Mr. Oliver's presentation early in the hospitalization, incidents in the 1:1 notes, the dementia diagnosis, and what Dr. Voss perceived to be Mr. Oliver failing to recognize his problem with alcohol. Yet, as Dr. Voss acknowledged, having impairments is not the same as lacking capacity.

Dr. Voss highlighted that Mr. Oliver told Dr. Podraza that *all* of his problems were due to the cold weather as an example of Mr. Oliver lacking insight. In fact, Mr. Oliver's heating system was a reality-based problem that needed to be addressed. During the same interview, Mr. Oliver also acknowledged his problems with alcohol and his plan to stop

16

drinking. While Mr. Oliver's characterization of all his problems being the result of cold weather was broad, he acknowledged both a drinking problem and a problem with his heating system during the same interview.

When asked whether Mr. Oliver should have been kept involuntarily, Dr. Voss did not answer in the affirmative. Instead he indicated that he would have tried to persuade Mr. Oliver to stay until an alternative could have been found. When Dr. Voss asked himself the rhetorical question whether he would have signed a "blue-paper", he did not say "yes", instead he testified he would have tried to work cooperatively with Mr. Oliver and the family. Additionally, Dr. Voss testified that sending Mr. Oliver to a locked unit would not have been successful because they (the locked unit) would have had to let him go (or he would have run away), suggesting that Dr. Voss agreed that Mr. Oliver had the capacity to make his own decisions and the next facility would have had to respect his wishes. Dr. Voss agreed that the "bar is pretty high to take away [someone's] autonomy".

The evidence also concerned Mr. Oliver's capacity to make good judgments. The Court is satisfied that a finding of capacity does not require that the person will make good judgments. People with capacity make bad decisions everyday, and one cannot look backward from a bad decision to determine a lack of capacity at the time the decision was made. In making a capacity determination, an examiner looks to the process of decision-making, not whether a decision may be good or bad – in the eyes of the examiner. The capacity determination is neutral in value-judgment.

The condition of the home to which Mr. Oliver desired to return is not important to the determination of whether Mr. Oliver had capacity to decide to return to his home. As noted by Dr. Nelson, many homeless people have capacity to make decisions for

17

themselves, and they are released from the hospital to a life on the streets without having any home to which to return. Mr. Oliver's situation was better than having no shelter at all.

While a patient with alcoholism must be asked the questions of whether he intends to stop drinking and whether he will accept treatment, the answers are not critical to the capacity determination. Several witnesses were questioned about the likelihood that Mr. Oliver would return to drinking upon his release. First, one cannot judge someone's current capacity on what the examiner thinks the person may do in the future. Additionally, the Court accepts that medical professionals cannot discount the possibility that someone in fact intends to quit drinking and that some people will be successful in doing so. Alternatively, if Mr. Oliver expressed an intention to stop drinking when he had no intention to do so, his statement would be highly corroborative of Mr. Oliver having the capacity to engage in manipulation, a skill requiring a substantial amount of cognitive ability. Thus, whether or not Mr. Oliver actually intended to stop drinking and the likelihood that he would return to drinking is not probative of his capacity to make his own decisions at the times relevant to this case.

A further issue presented by the evidence is the impact of a possible diagnosis of dementia. The parties dispute whether Mr. Oliver had dementia in May of 2013. The discharge summary recited a diagnosis of "probable alcohol-induced dementia". Drs. Podraza, Nelson and Fromson all concluded that Mr. Oliver did not have dementia. The admission diagnosis listed acute or chronic hepatic encephalopathy, and did not list dementia at all. On March 23, 2013, Dr. Singer wrote "rule out underlying alcohol dementia", but noted that he doubted ETOH dementia. On March 26, 2013, Dr. Redding listed alcoholic dementia in his note, although it appears too early in Mr. Oliver's

18

hospitalization to actually make this diagnosis. Thereafter, it appears that the dementia diagnosis was at times carried forward by some providers.

The examination by Dr. Podraza on May 7, 2013, in combination with other factors in this case, causes the Court to seriously question whether Mr. Oliver had dementia. Mr. Oliver did well on the long-term memory/delayed recall test, his ability to name objects was fine, and his orientation was appropriate. However, whether or not Mr. Oliver had "probable alcohol-induced dementia" is not particularly helpful in determining whether Mr. Oliver had the capacity to make his own decisions at the time of discharge. The label of dementia does not define the range of capabilities people with dementia may have. Even Dr. Voss, Plaintiffs' expert witness, testified that a person with alcohol-induced dementia can be discharged if the person has demonstrated capabilities.

Overall, the medical records reflect that when Mr. Oliver entered the hospital he was in delirium, unable to steadily walk and sometimes using a walker, unable to effectively communicate, was at least periodically incontinent, and was not attending to his ADLs. Over time, Mr. Oliver went from being partially disoriented to being fully oriented and from slurring and mumbling words to engaging in normal conversation. He vastly improved physically. During his hospitalization, Mr. Oliver progressed to eating well and sleeping well. His medications were decreased. Mr. Oliver began an exercise program, doing multiple laps around the hospital corridor counting his laps. His ability and willingness to independently attend to his hygiene needs vastly improved. Over time, Mr. Oliver began playing cards alone and with his 1:1 workers[2]; he watched TV (including the Red Sox, an apparent pre-hospitalization interest); he gave answers to the questions on the "Wheel of

[2] In fact, the April 7, 2013 Nurse's Note recites that Mr. Oliver was "learning" a card game.

19

Fortune" television show; he did word search games; he read; he used the "Uncle Henry's" publication (a buying and selling publication) to help a nurse tech and others locate items they were looking to purchase (such as a play set, which he also helped arrange for delivery). Mr. Oliver was also able to place telephone calls to the people of his choosing. These activities all suggest that Mr. Oliver had regained mental functioning and support the conclusions of Dr. Podraza, Mr. Cravens, Dr. Nelson, and Dr. Fromson that Mr. Oliver had capacity to manage his person.

The Court finds that Mr. Oliver improved over time, and that his behaviors and condition earlier in his hospitalization and the opinions expressed earlier in his hospitalization do not reflect his condition by early to mid-May 2013. Due to the marked improvement to Mr. Oliver physically and mentally, the Court discounts those observations made more remote in time to Mr. Oliver's discharge.

Basically, from the time of his admission to the time of his discharge, Mr. Oliver articulated his desire to go home[3]. By April 11, 2013 and continuing, Mr. Oliver stated that he could take care of himself. The Court is satisfied that by April 11, 2013, Mr. Oliver appreciated that others were concerned with whether or not he could care for himself. Mr. Oliver articulated that he had taken care of himself for years and could do so again. On May 6, 2013, Mr. Oliver was asserting that EMMC had "no right" to keep him at the hospital. The Court is satisfied that by May 6, 2013, Mr. Oliver was able to appropriately assert his desire to go home and framed the desire in a manner that implicated his autonomy.

---

[3] The Court does not find Mr. Oliver's repeated requests to go home or attempting to leave during the later part of his hospitalization either irrational or suggestive of a lack of capacity. If someone is being kept against his will, it does not seem unreasonable for that person to attempt to leave and/or to repeatedly demand release.

20

Mr. Cravens, a certified nurse practitioner, began caring for Mr. Oliver on May 13, 2013 when Dr. Al-Sawalha signed off. At that time, Mr. Cravens had been a hospitalist for approximately 16 years. On May 13, 2013, Mr. Cravens found Mr. Oliver to be alert and oriented x 3 and their conversation made sense. Mr. Cravens concluded that Mr. Oliver had been medically stable for some time and that he did not need to be in the acute care hospital. However, Mr. Cravens understood that Mr. Oliver could not be discharged at that time due to "other issues" (legal).

Mr. Martin, the hospital's attorney, was consulted about the legality of discharging Mr. Oliver once the hospital had both a recent neuropsychological report stating that Mr. Oliver had capacity and knowledge that Mr. Oliver's children had been appointed as his guardians. Mr. Martin initially stated that the hospital could not discharge Mr. Oliver without the guardians' consent. However, after reviewing the actual "Limited Guardianship" Order, Mr. Martin told hospital staff that they could legally discharge Mr. Oliver.

Events which occurred on May 16, 2013 just before discharge corroborate the finding that Mr. Oliver had capacity at that time. In particular, on May 15, 2016, Mr. Woolley suggested that Mr. Oliver obtain financial information (the amount of his monthly social security check and his bank account balance) to finish the paperwork to terminate the Guardianship. Upon Mr. Woolley's arrival at the hospital on May 16, 2013, Mr. Oliver had obtained the necessary information. Mr. Oliver's ability to understand that he needed to report his monthly income and the balance of his bank account to Berry Woolley so that the Termination of Guardianship paperwork could be completed, and to determine these

21

numbers, and to seek out Berry Woolley the next day to report these numbers, is strong evidence that Mr. Oliver had regained capacity by May 15-16, 2013.

Mr. Cravens re-examined Mr. Oliver on May 16, 2013. Mr. Cravens again determined that Mr. Oliver did not need hospital care. Mr. Cravens found that Mr. Oliver was not agitated and showed no signs of dementia. While Mr. Oliver had some limitations on insight and judgment, Mr. Cravens found that at the time of discharge Mr. Oliver had sufficient insight and judgment to manage his person. Based on his own assessment of Mr. Oliver, Dr. Podraza's opinion that Mr. Oliver had regained capacity, Mr. Oliver's stated desire to be discharged to home, and his understanding that Mr. Oliver could now legally be discharged, Mr. Cravens discharged Mr. Oliver on May 16, 2013. Mr. Oliver was very happy to be discharged. The Court finds Mr. Cravens took a common sense approach in making the discharge decision and made a reasonable decision. The Court found Mr. Cravens' testimony very credible.

Additionally, events occurring at the time of discharge are consistent with Mr. Oliver having capacity on May 16, 2013. Mr. Oliver's choice to have his friend, Mr. Ayers, drive him home from the hospital, rather than asking his daughter or former wife for a ride suggests that Mr. Oliver appreciated that his daughter and former wife might attempt to disrupt his discharge. Also, on May 16, 2013 after learning that Mr. Oliver was being discharged at around 2:00 p.m., Ms. Oliver called and asked Mr. Oliver who was picking him up from the hospital. Mr. Oliver responded Ever (Everet) and the phone hung up. About a half hour later, Ms. Oliver called Mr. Oliver again and asked to speak to Ever, and Mr. Oliver declined to allow Ms. Oliver to do so. Mr. Oliver's refusal to allow Ms. Oliver to speak to Ever demonstrates his ability to understand and interrupt any plans Ms. Oliver may have had to

22

cause Ever not to give Mr. Oliver a ride home. This shows capacity. During the discharge process, staff urged Mr. Oliver to not return to drinking. Mr. Ayers stated that if Mr. Oliver was going to drink, Mr. Ayers would not transport him home. Mr. Oliver agreed not to drink. This statement by Mr. Oliver was either a reflection of what Mr. Oliver truly hoped to do or was a comment motivated by his desire to leave the hospital. Either way, this statement demonstrates an appreciation by Mr. Oliver of the circumstances in which he found himself.

Finally, Mr. Oliver's conduct immediately following his release from the hospital is consistent with the determination that he had capacity at the time of his release. Mr. Ayer, his friend and driver, stopped at Wal-Mart on the way from EMMC to Mr. Oliver's home. Mr. Oliver was able to go into the store, identify and find what he wanted, and then purchase the items. Mr. Ayer clearly was not with Mr. Oliver during critical times during the shopping stop as Mr. Ayer did not know what Mr. Oliver had purchased. Further, on the ride home, Mr. Ayers stopped at the Town Office to register his motorcycle. While there, Mr. Oliver asked the Town Clerk about the status of his real estate taxes. This inquiry was appropriate and demonstrated an ability by Mr. Oliver to consider his living situation and make appropriate inquiries.

Moreover, when he returned home, Mr. Oliver crawled through the basement window to gain entrance into his home. He found his way into his home, and up onto the main living floor. Again, Mr. Oliver was able to identify the problem (not able to get into his home through the locked door), to consider alternatives to enter his home, and then to execute a successful plan to enter his home. According to Mr. Ayer, Mr. Oliver strategically blocked Mr. Ayer's entrance into the Oliver home, and Mr. Ayer left. An hour or two later,

23

Mr. Oliver called Mr. Ayer and asked him to deliver some matches. Mr. Ayer delivered the matches and Mr. Oliver took the matches from Mr. Ayer through a window. Again, Mr. Oliver was able to identify a problem (the need for matches to start his woodstove) and execute a reasonable and successful plan to acquire the matches.

Unfortunately, Mr. Oliver began drinking again very soon after he returned to his home. Depending on how much a person has to drink, that person's capacity may diminish. And, when someone drinks heavily, the person's judgment can become impaired.

The Court has fully considered Plaintiffs' arguments that Mr. Oliver's behaviors and condition at the time of his admission and thereafter suggest that Mr. Oliver lacked capacity on May 16, 2013. The Court has also fully considered Plaintiffs' arguments that the opinions of several people that Mr. Oliver lacked capacity at the time of his admission and for some time thereafter, including those of Ms. Kreamer and Ms. Manocchio, suggest that Mr. Oliver lacked capacity on May 16, 2013. The Court has also considered Dr. Redding's opinion made on April 1, 2013 that Mr. Oliver's prognosis was "probably poor for recovery of appropriate insights necessary for self care". There is absolutely no question that Mr. Oliver was in very rough shape physically and mentally at the time of his admission. However, the Court specifically finds that Mr. Oliver's condition – physically and mentally – significantly improved over the course of his hospitalization. Therefore, the Court discounts the observations and opinions made earlier in Mr. Oliver's hospital stay.

The Court has particularly reflected on those incidents highlighted by the Plaintiffs closer in time to the discharge in analyzing the capacity issue. These issues included, among other things, Mr. Oliver climbing on a window, making requests for return of bottles, urinating outside, not following directions, and the question about the identity of

24

his ex-wife. Mr. Oliver was allowed to go outside with his 1:1 and after walking quickly toward some fencing urinated "beside building". There is simply insufficient context in the 1:1 note to give much weight to this consideration. Similarly, the Court considers, but does not give much weight to the suggestion that Mr. Oliver was climbing on a window because the context of the act is unknown. The Court does not find Mr. Oliver's request that someone return bottles for him to be troubling. In fact, the Court finds Mr. Oliver's collecting bottles while he was in the hospital to be a reasonable effort by him to secure some spending money and is some evidence of an intact thought process. Additionally, the Court accepts that Mr. Oliver became quite bored in the hospital and some of the behavioral issues cited by the Plaintiffs are attributable to his frustration and/or were efforts to leave when being kept against his will.

The Court has given great consideration to the question about Mr. Oliver's recognition or non-recognition of his ex-wife on May 16, 2013. This incident is by far the incident that the Court finds deserves the most analysis. The 1:1 note states: "Randy's ex-wife at desk. Randy asks if she (the women (sic) who had a change in hair color) is his ex-wife. The women (sic) said no and chuckled...". The note suggests that Mr. Oliver was making a joke about seeing his ex-wife. Clearly, Mr. Oliver had some recognition of Ms. Oliver as he at least wondered if she was his ex-wife and suggested that her hair color had changed. The documented response by Ms. Oliver does not suggest that she was alarmed. The note states that Ms. Oliver "chuckled". However, in her in-court testimony, Ms. Oliver clearly expressed being very concerned by this comment by Mr. Oliver. Dr. Podraza testified that people who are recovering from alcohol abuse have mental "glitches". Dr. Fromson testified that as the brain recovers one expects that episodes of inappropriate

25

behaviors may occur. The Court considers the evidence with respect to Mr. Oliver's interaction with his ex-wife on May 16, 2013, along with all the other evidence in this case.

The Court has also considered Barry Woolley's interaction with the Ombudsman's office on May 7, 2013. Plaintiffs' argue that Mr. Woolley told the Ombudsman that Mr. Oliver likely would not regain capacity and that he needed a facility to keep him from going back to the community to start drinking and becoming unsafe again, and the Court is satisfied that Mr. Woolley made statements similar to this. The Court completely understands the family's discomfort with one hospital employee making these types of statements in the morning and another hospital employee determining in the afternoon that Mr. Oliver had regained capacity. However, from a more detached viewpoint, Mr. Woolley was advocating in the morning trying to secure a bed for Mr. Oliver as that was the plan at that point in time. The assessment of EMMC up until the time Dr. Podraza completed his second evaluation was that Mr. Oliver did not have capacity. As a social worker, Mr. Woolley was required to accept that Mr. Oliver lacked capacity – until that assessment changed.

Plaintiffs also argued that Mr. Oliver did not know why he was in the hospital and this demonstrated a lack of insight. The context of this "confusion" is unknown. Moreover, the suggestion that Mr. Oliver did not know why he was in the hospital must be put in context with what is known. By mid-April there was no medical need for Mr. Oliver to be in the hospital because he had no acute medical needs, and therefore statements by Mr. Oliver that he did not know why he was still being kept at the hospital could, depending on the context, be interpreted as astute. In fact, on April 17, 2013, Mr. Oliver articulated that the

hospital was not doing anything for him, which was accurate from an acute medical point of view. The Court considers this evidence with all the other evidence in this case.

Mr. Ayer testified that on the ride home from the hospital Mr. Oliver vacillated between promising not to drink and wanting to get beer. Mr. Ayer told Mr. Oliver that if he was going to drink Mr. Ayer would return him to the hospital, to which Mr. Oliver responded that he would not drink. Mr. Oliver's vacillation has many explanations: confusion by Mr. Oliver, a desire to test Mr. Ayer's resolve not to help him buy alcohol, and/or a desire by Mr. Oliver to really try to quit drinking. The Court considers Mr. Ayer's testimony on this issue along with all of the other evidence in the case.

Plaintiffs also suggest that a voice message from Coris Miller in mid-April, 2013 suggesting that Mr. Oliver's bed was costing $1,500.00 per day and that the family needed to do something to move Mr. Oliver out of the hospital supports their theory that EMMC acted inappropriately in discharging Mr. Oliver on May 16, 2013. First, Ms. Miller was not involved in Mr. Oliver's discharge about a month later on May 16, 2013, and the Court does not find that EMMC was improperly motivated by financial concerns in discharging Mr. Oliver. By May 16, 2013, EMMC and the family were in a dilemma: the professionals opined that Mr. Oliver had regained his capacity and they worried they were holding him against his will, and yet the guardians wanted Mr. Oliver to be discharged to a locked facility.

In addition, Plaintiffs argued that EMMC engaged in a plan (conspiracy) to inappropriately discharge Mr. Oliver from EMMC because of funding issues, and that the factors taken together support this conspiracy theory. There is no doubt that having Dr. Podraza reevaluate Mr. Oliver on the very day of the guardianship proceeding and then having the hospital change its legal position over the course of a few days, in combination

27

with other individual factors, provided a reason for the Plaintiffs to be skeptical. However, after a full review of all the facts and circumstances, the Court does not accept that EMMC engaged in any inappropriate plan or conspiracy to inappropriately discharge Mr. Oliver. EMMC and Mr. Oliver's family had different ideas about the discharge of Mr. Oliver, but the Court does not accept that EMMC singled out Mr. Oliver for inappropriate discharge or that his discharge was inappropriately motivated.

After careful consideration of all the facts and circumstances in this matter, the Court finds that, although he had some cognitive impairments, Mr. Oliver had "capacity" to manage his person on May 16, 2013. The Court finds the testimony of Mr. Cravens, Dr. Podraza, Dr. Fromson and Dr. Nelson compelling. Dr. Al- Sawalha was sufficiently struck by Mr. Oliver's mentation to order a repeat neuropsychological evaluation. After a repeat evaluation and in-person interview of Mr. Oliver, Dr. Podraza found that Mr. Oliver had the capacity to manage his person. Mr. Cravens examined Mr. Oliver on both May 13 and May 16, 2013. Mr. Cravens found, based on his own evaluation and relying on the Dr. Podraza evaluation, that Mr. Oliver had the capacity to make his own decisions and manage his person. Both Dr. Fromson and Dr. Nelson opined that Mr. Oliver had the capacity to make his own decisions and manage himself on May 16, 2013. Dr. Fromson and Dr. Nelson held this opinion even after considering many of the factors the Plaintiffs suggested demonstrated that Mr. Oliver did not have such capacity. While the factors asserted by the Plaintiffs may cause some pause on whether Mr. Oliver had capacity, the Court does not find these factors, in light of all the other evidence in this case, to be persuasive.

## B. Reasonable Discharge Plan

Having concluded that Mr. Oliver had "capacity" on May 16, 2013, the next issue is whether or not EMMC's discharge plan for Mr. Oliver satisfied the standard of care.

There was no disagreement on the standard of care: EMMC was required to offer Mr. Oliver a safe and reasonable discharge plan. There was also no disagreement that a hospital or a family cannot force a person to engage in substance abuse counseling[4]. Additionally, there was no disagreement that competent people can and do make poor decisions, including drinking to excess and declining services. There was no disagreement that Mr. Oliver had no medical need for hospitalization when he was discharged. Finally, there was no disagreement that Mr. Oliver consistently and definitely expressed his desire to be discharged to his home.

Dr. Voss testified that EMMC failed to meet the standard of care in discharging Mr. Oliver because, in particular, it did not adequately account for Mr. Oliver's safety.[5] At the same time, Dr. Voss agreed that *if* Mr. Oliver were deemed to have had adequate capacity, EMMC was required to release him. Dr. Voss further testified that *if* Mr. Oliver were deemed to have had adequate capacity, the discharge plan by EMMC was reasonable *if* steps had been taken before he left to implement the plan. Dr. Fromson testified that the

---

[4] The Oliver family had experienced this same roadblock prior to Mr. Oliver's 2013 hospitalization when they had attempted to find a substance abuse program for Mr. Oliver. They had tried programs as far away as California. The Olivers knew that a person would not be admitted into substance abuse treatment programs, unless he were willing to accept the help.

[5] At least some of Dr. Voss' opinions seemed to be premised on the assumption that Mr. Oliver did not have adequate capacity and/or that he should not have been discharged without the guardians' consent.

29

hospital was required to discharge Mr. Oliver, and that the discharge plan met the applicable standard of care.

At first glance, it appeared there was disagreement between the experts on the relevancy of whether or not it was likely that Mr. Oliver would return to drinking after discharge. Dr. Voss opined that it was entirely reasonable to conclude it was highly likely Mr. Oliver would return to drinking after discharge and that this factor had to be considered in the discharge plan. Dr. Voss further suggested that EMMC accepted Mr. Oliver's statements he would not continue to drink, and this was negligent, but the Court does not find that EMMC "accepted" these statements in that the discharge plan offered Mr. Oliver substance abuse and other services. Dr. Fromson opined that whether or not Mr. Oliver would return to drinking was not a reason to not discharge Mr. Oliver on May 16, 2013. Dr. Fromson testified that a patient's statement he will refrain from alcohol must be taken at face value because the hospital never knows when the "miracle of recovery" will happen. Dr. Fromson also opined that even if Mr. Oliver had no intention to refrain from drinking, discharge was still appropriate because competent people have the right to make their own decisions about drinking. After analysis, it does not appear to the Court that there is much substantive disagreement between Dr. Voss and Dr. Fromson on this factor. Dr. Voss did not opine that a competent person can be denied discharge because it is likely he will return to drinking and Dr. Fromson did not opine that the discharge plan should ignore the fact a person has a drinking issue. The Court finds that the hospital could not keep Mr. Oliver against his wishes because he might/was likely to return to drinking[6].

---

[6] Taking away the liberty of alcoholics was abolished in 1973. *See* 22 M.R.S. §§ 1353, repealed by P.L. 1973, ch. 566 § 4 (effective Jan. 1, 1974) *and* P.L. 1973, ch. 582, § 4 (effective Jan. 1, 1974). In 2013, the criteria for involuntarily commitment to a facility required that the person had a mental

30

By the time of discharge, Mr. Oliver had admitted to EMMC staff that he was an alcoholic. Mr. Oliver told Ms. Miller about his drinking and told her he would "try" to stop. Mr. Oliver admitted to Dr. Podraza that he was an alcoholic and his plan was to stop drinking. Mr. Oliver's change from denying a problem with alcohol early in his hospitalization to admitting he was an alcoholic is very significant progress and demonstrates some insight on this issue.

Dr. Fromson further testified that compliance with the applicable standard of care does not prevent people with substance abuse disorders from regularly being discharged from hospitals, and that hospitals are not required to investigate or address the home environment to which a person is returning (other than in Massachusetts for abusive situations). The Court was struck by Dr. Fromson's testimony that homeless people are discharged from hospitals everyday. There is obviously no good plan in place for their housing, safety or nutrition. Mr. Oliver was clearly in a much better position than people without shelter or family support. The Court is fully satisfied that the standard of care does not require that the hospital refuse discharge due to the safety of the patient's home or the person who the patient choses for transportation.

In the course of his evaluation, Dr. Podraza discussed with Mr. Oliver what might be helpful to him upon his release from the hospital. Mr. Oliver rejected attending substance abuse counseling and/or attending AA. However, Mr. Oliver accepted Dr. Podraza's suggestions that he (Mr. Oliver) attend the Pain Clinic and that he engage with a community case manager, and Dr. Podraza made those recommendations. Dr. Podraza sought and

---

illness and because of the mental illness the person posed a likelihood of serious harm to himself or others. *See* MRS 34-B M.R.S. § 3863 (also known as blue-papering).

31

received "buy-in" from Mr. Oliver on these two recommendations. While Dr. Voss was critical of EMMC not exploring options Mr. Oliver would accept, the Court is satisfied that case management, an option specifically mentioned by Dr. Voss, was explored by EMMC and Mr. Oliver accepted this option and it was part of the discharge plan.

There were four (4) primary components of the discharge plan: 1) an appointment with the Pain Clinic; 2) a recommendation that Mr. Oliver attend substance abuse treatment; 3) a referral for community case management; and 4) an appointment for follow-up with his PCP. Additionally, Mr. Oliver's medications were outlined for him. EMMC also notified DHHS Adult Protective Services that Mr. Oliver was being discharged[7]. As noted, the Pain Clinic and community case management recommendations made by Dr. Podraza were incorporated into the discharge plan. The referral to the Pain Clinic was designed to help address Mr. Oliver's chronic back pain and would have also been another opportunity for Mr. Oliver to have been offered substance abuse treatment. The case management referral was to "help him achieve his goals of sobriety and a better living situation". An appointment for the follow-up with his PCP was scheduled for May 20, 2013 at 2:30 p.m., four days after discharge, and the PCP also agreed to send Mr. Oliver a reminder notice. An appointment was made with the Pain Clinic for Mr. Oliver. Mr. Oliver was given the name and telephone number for the community case management services, both verbally and in the written discharge instructions. Mr. Woolley gave Ms. Jernigan

_____

[7] A referral had been made earlier by EMMC to DHHS Adult Protective Services. The purpose of notifying DHHS of the discharge was two-fold: 1) because EMMC was concerned that the guardians were insisting that Mr. Oliver be locked away after he had regained his capacity, and EMMC believed Mr. Oliver needed an advocate because the guardians were not honoring Mr. Oliver's regained capacity, and 2) for monitoring in case Mr. Oliver started drinking again.

32

information about the PCP appointment, but Ms. Jernigan hung up before the remainder of the information could be given to her.

By the time of discharge, Mr. Oliver was communicating effectively, eating well, sleeping well, walking very well and a great deal, attending to his hygiene, using the bathroom facilities, aware of his medications, and dressing himself. If Mr. Oliver did not resume heavy drinking, there is no reason to believe he could not have continued to perform these functions. Prior to his hospitalization, Mr. Oliver had lived alone for several years and taken his prescribed medication (including methadone). Mr. Oliver's condition certainly did not regress during his hospitalization. Mr. Cravens opined that Mr. Oliver was capable of taking his own medications, and this seems reasonable in that he had done so prior to his hospitalization. Upon discharge, Mr. Oliver did not have any mobility limitations, and he did not need physical therapy, occupational therapy or any skilled nursing (no IVs or wound care).

Mr. Oliver's nurse spent about 15 minutes reviewing the discharge paperwork with him. He indicated to his nurse, Ms. Kinjo, that he understood the instructions.

Dr. Fromson opined that EMMC met and exceeded the standard of care in discharging Mr. Oliver on May 16, 2013. Dr. Fromson based this opinion on the fact that Mr. Oliver was medically stable; he had been offered substance abuse treatment; he had received appropriate referrals to follow-up with his PCP, the Pain Clinic, and case management; and hospital staff had urged him to attend peer support groups such as AA. Dr. Fromson further testified that the "lynchpin" with respect to the referrals is whether or not Mr. Oliver was interested in the services.

33

Dr. Voss was critical of EMMC not making a specific appointment for Mr. Oliver for case management services. Mr. Woolley located a particular case management provider in Mr. Oliver's community and gave Mr. Oliver the information he needed to make an appointment. Mr. Oliver's PCP was aware of the case management recommendation, and Mr. Oliver had an appointment with his PCP 4 days after his discharge. The Court is satisfied that the failure to make this one appointment, in light of the specific PCP appointment, does not equate to a failure to meet the standard of care.

Dr. Voss also criticized the "abruptness" of Mr. Oliver's discharge and what he described as a lack of effort by EMMC to persuade Mr. Oliver to accept services and/or work with the family to find placement during the hospitalization.

The abruptness of the discharge, after Mr. Oliver had been in the hospital about 7 weeks, warrants analysis. Had the guardians had more notice that Mr. Oliver was going to be discharged they *may* have been able to persuade Mr. Oliver to change his mind about going home, or *may* have persuaded him to voluntarily enter rehabilitation, or *may* have been able to make repairs to the house or taken some other steps. On or before April 15, 2013, the guardians were aware that EMMC wanted to discharge Mr. Oliver. Between April 15, 2013 and May 16, 2013, the children/guardians were insisting on discharge to a locked facility and were not interested in a discharge plan that involved any other type of discharge[8]. On May 10, 2013, a "Non-Covered Continued Stay" notice was issued. This Notice informed Mr. Oliver/the guardians that EMMC believed that Medicare would not pay for continued hospitalization because "your medical condition no longer requires acute

[8] Prior to April 15, 2013, an EMMC discharge planner attempted to find a locked placement for Mr. Oliver, but once he significantly improved, she stopped those efforts believing they were futile. This is actually consistent with Dr. Voss' testimony that the next facility would not have been able to keep Mr. Oliver.

34

care" and that Mr. Oliver/the guardians would be responsible for the costs. It appears they filed an appeal, which was denied, and Mr. Woolley informed them of the denial on May 13, 2013. Therefore, the guardians were well aware that EMMC was more than ready to discharge Mr. Oliver by May 10, 2013 (and earlier). However, as of May 16, 2013 before 1 pm (other than a voicemail message), they had not been specifically told anything about discharge other than that Mr. Oliver would not be released without their consent and that EMMC would get a capacity re-evaluation. It was after the guardian(s) withdrew their request for a re-evaluation that EMMC moved forward with its legal analysis about discharge.

On May 16, 2013, at approximately 11:30 a.m., Mr. Cravens made the decision to discharge Mr. Oliver. At 1:00 p.m., Ms. Jernigan was told that Mr. Oliver would be released at 2:00 p.m. (although a voice message had been left earlier).[9] Even 2 ½ hours would have been more time to prepare than the one hour they were given. However, the question in this case is not whether the hospital was considerate or kind to Mr. Oliver's children/guardians, but rather whether the hospital was negligent. While the Court is mindful of the lack of much concrete notice to Mr. Oliver's guardians, in the final analysis, the Court is nonetheless satisfied that EMMC's duty was to release Mr. Oliver as soon as he was deemed to have capacity and demanded release. Further, EMMC complied with 18-A M.R.S. 5-807(c).

The Court is satisfied that EMMC worked with Mr. Oliver during his hospitalization to encourage him to accept substance abuse treatment. In fact, some progress was made in that prior to discharge Mr. Oliver admitted his problems with alcohol and expressed a

---

[9] Mr. Oliver was actually released at approximately 2:50 p.m.

desire to stop drinking. The Court is further satisfied that the discharge plan factored in the likelihood that Mr. Oliver would return to drinking by talking with Mr. Oliver and strongly urging him not to drink, to attend AA, and by offering him substance abuse counseling. During the hospitalization, Ms. Miller spoke with Mr. Oliver about not drinking. Dr. Podraza specifically encouraged Mr. Oliver to accept substance abuse services, and the referral to the Pain Clinic was another avenue for the issue of substance abuse treatment to be addressed with Mr. Oliver. Prior to leaving the hospital, Mr. Oliver was encouraged by many EMMC personnel not to return to drinking. EMMC personnel warned him that returning to drinking would have grim consequences. Mr. Woolley discussed with Mr. Ayer not making it easy for Mr. Oliver to get alcohol. Mr. Oliver was repeatedly urged to agree to alcohol counseling and to attend AA, but he refused counseling and he indicated that he did not intend to attend AA.

The Court is further satisfied that EMMC adequately attempted to work with Mr. Oliver's family on placement issues. Throughout the hospitalization Mr. Oliver was consistent and adamant that he be discharged home. Meanwhile, the family was adamant that Mr. Oliver not be discharged other than to a locked facility, including after being told that Mr. Oliver had regained capacity. It is clear to the Court that this insistence by the family was based on love for Mr. Oliver and a properly motivated hope that he would address his alcoholism. However, once Mr. Oliver regained capacity, he had the right to address or not address his alcoholism, as he saw fit. As early as April 15, 2013, EMMC through Coris Miller was urging the family to find a placement for Mr. Oliver that was suitable to them. Ms. Miller's responsibilities for Mr. Oliver's case were eventually transferred to Mr. Woolley, who had been participating in Mr. Oliver's case all along as

36

well.[10] After Mr. Oliver's daughter was informed by Mr. Woolley that EMMC had determined that Mr. Oliver had regained his capacity, Ms. Jernigan remained adamant that Mr. Oliver be forced into a secure facility. Mr. Woolley asked the family to participate in a meeting to discuss discharge. At first, Mr. Woolley's telephone calls in this regard were not returned, and then Ms. Jernigan indicated that the meeting could not occur during the workday and in any event she would not consent to any discharge other than to a locked facility. Mr. Woolley convincingly testified that he made multiple attempts to draw the guardian(s) into productive discussions about the discharge of Mr. Oliver, but ran into a "brick wall". In this same time frame, the guardians initially asked for an independent neuropsychological evaluation from an evaluator not connected with EMMC. When given names outside the EMMC system, the guardian(s) stated they wanted to think about it. Thereafter, over the period of a few days, they did not respond to requests by EMMC to move the process along. They ultimately informed EMMC on or about May 14, 2013 that they did not want an additional neuropsychological examination.

Unfortunately, within a few hours of his discharge, Mr. Oliver returned to drinking. When his daughter and ex-wife visited him at 5:00 p.m., he had a beer in his hand and was putting wood in his woodstove. The second time they visited him, at about 8:00 p.m., Mr. Oliver was "definitely" intoxicated. He had continued his efforts to light a fire and there was some "glow" in the woodstove while his daughter and ex-wife were present the second time. Within a couple of hours of them leaving, Mr. Oliver's home was engulfed in flames.

---

[10] Ms. Miller asked to be removed from Mr. Oliver's case because of what she perceived to be a lack of cooperation from Mr. Oliver's family and the family perceiving her as harassing them, and because she also felt that Mr. Oliver was being "imprisoned" by the hospital. The content and tone of Ms. Miller's April 15, 2013 voice mail to Ms. Jernigan seems to reflect her frustration with the situation.

37

Because the Court has found that Mr. Oliver had capacity to make his own decisions and because he clearly expressed his desire to be released to his home, the Court does not find that the safety of Mr. Oliver's home or the background of the person who Mr. Oliver chose to transport him home are factors that EMMC was bound to investigate or with respect to which EMMC was required to take action, nor could EMMC refuse to discharge Mr. Oliver because he might/was likely to resume drinking. People who have capacity to make their own decisions may be released to the place of their choosing and may be transported by a person of their choice. At the time of discharge, there was no reason that Mr. Oliver could not manage himself as well as any other person with limited resources living in rural Maine – until he started heavily drinking again. At that point, the guardians would have to step in to monitor changes and assist him or remove him from the situation.

The Court concludes that it was appropriate for EMMC to discharge Mr. Oliver. He had no acute medical needs and he had sufficient capacity to manage his own affairs and it was his choice where to go after discharge. The Court finds that the discharge plan for Mr. Oliver was reasonable, and that the discharge met the applicable standard of care. Therefore, the Court finds that Plaintiffs failed to prove by a preponderance of the evidence that EMMC was negligent.

Clearly what Mr. Oliver needed most to address his disease was alcohol treatment services. However, Mr. Oliver repeatedly declined those services. All the witnesses agreed that alcohol treatment programs are not available to people who are not ready to address their issues with alcohol. Therefore, there was really no alcohol treatment services that

38

EMMC, or his family, or society as a whole could provide to Mr. Oliver at that point in time.[11]

## II. Infliction of Emotional Distress

In ruling on Plaintiffs' Motion to Amend their Complaint to add Counts IV, V, VI, and VII, the Court determined that the Wrongful Death Statute precluded most of their claims for emotional distress, but permitted Plaintiffs to proceed with their claims to the extent they were not related to Mr. Oliver's discharge. See Order dated August 12, 2015. After hearing the evidence, the Court finds that Plaintiffs failed to establish claims for Infliction of Emotional Distress.

## CONCLUSION

The Entry is: Judgment for the Defendant on Counts I, II, III, IV, V, and VII[12]. The Clerk shall enter this Judgment upon the docket by reference.

Dated: August 5, 2016

Date entered on Civil Docket: 8|8|16

Ann M. Murray, Justice
Maine Superior Court

---

[11] While the Court does not reach the question of damages, it was clear to the Court that Nicole Jernigan and Randy Oliver, Jr. both enjoyed a strong relationship with their father. They were able, to the great credit of their mother, to accept Mr. Oliver's disease and love their father and receive love from him in return.

[12] The motion to amend the Complaint for a third time, resulting in the Second Amended Complaint (Revised), was denied as to VI, so that claim is not pending.

39